# United States District Court

| | | |
|---|---|---|
| **EASTERN** | District of | **CALIFORNIA** |

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

**Wildwood Self Storage, 18800 Pine Shadows Lane, Unit #221, Penn Valley, California 95946**

CASE NUMBER:

I, <u>JON RASMUSSEN</u>, being duly sworn depose and say: **2:14-SW-0172 — KJN**

I am a(n) <u>SPECIAL AGENT-DEA</u> and have reason to believe that ☐on the person of or ☒on the property or premises known as (name, description and/or location)

**SEE ATTACHMENT A-3**

| | | | |
|---|---|---|---|
| in the | **EASTERN** | District of | **CALIFORNIA** |

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of THE Federal Rules of Criminal Procedure)

property that constitutes evidence, fruits, and/or instrumentality of a criminal offense

concerning a violation of Title <u>21</u> United States Code, Section(s) <u>841(a), 846, 856(a)</u>

The facts to support a finding of probable cause are as follows:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

**FILED**

**MAR 25 2014**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

Continued on the attached sheet and made a part hereof.  ☒Yes  ☐No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

March 25, 2014
Date

at  Sacramento, California
City    State

_____

Kendall J. Newman, U.S. Magistrate Judge

_____
Signature of Judge

**SEALED**

## AFFIDAVIT OF DEA SPECIAL AGENT JON RASMUSSEN

I, Special Agent Jon Rasmussen, United States Department of Justice, Drug Enforcement Administration ("DEA"), do swear and affirm as follows:

### INTRODUCTION

1.    This affidavit is furnished to support a search warrant for the following locations, which are located in the Eastern District of California: 7714 Sky View Ct, Browns Valley, CA, Yuba County Assessor's Parcel Number (APN) 056-320-004-000 and Wildwood Self Storage, 18800 Pine Shadows Lane, Unit #221, Penn Valley, CA:

   a.  **7714 Sky View Ct, Browns Valley, California ("Subject Premises"); and**

   b.  **Wildwood Self Storage, 18800 Pine Shadows Lane, Unit #221, Penn Valley, California 95946 ("Unit #221").**

2.    Based on the facts and circumstances contained in this affidavit, there is probable cause to believe the Ryan MacIntyre Drug Trafficking Organization (DTO) uses these locations to conceal fruit, instrumentalities, and evidence from the cultivation, sale and distribution of marijuana in violation of federal laws, including 21 U.S.C. §§ 841(a) (manufacture or cultivation of marijuana), 846 (conspiracy to distribute marijuana), and 856(a) (maintaining premises for the illegal purpose of manufacturing and distributing marijuana).

3.    The **Subject Premises** is located on approximately 18.8 acres of remote rural property, and consists of a main residence, out-buildings, a greenhouse, and an outdoor marijuana cultivation site. The **Subject Premises** is described in more detail and depicted in Attachments A1-A2. **"Unit #221"** is a storage unit located at the Wildwood Self

Storage, 18800 Pine Shadows Lane, Penn Valley, California, and is described in more detail and depicted in Attachment A-3.

4.    The facts and information set forth in this Affidavit are based upon my personal knowledge obtained during this investigation, information provided to me by other law enforcement officers, and other documents and records obtained as a result of this investigation. Because this affidavit is submitted for the limited purpose of setting forth probable cause for the requested search warrant, I have not included each and every fact known to me concerning this investigation. I have included what I believe to be adequate facts to establish probable cause that evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, and 856(a) will be found at the **Subject Premises** and **Unit #221**.

## AGENT BACKGROUND

5.    I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") assigned to the San Francisco Divisional Office, and have been so employed since September 2004. I received 16 weeks of specialized training at the DEA Academy, Quantico, Virginia, including training in conducting narcotics investigations, drug identification, drug interdiction, methods of smuggling, manufacturing, packaging, and distribution of drugs; training in undercover operations, laundering of drug proceeds, asset forfeiture, use of confidential sources, and the legal aspects of conducting drug investigations.

6.    During the course of my employment with the DEA, I have participated in numerous narcotics investigations using various law enforcement techniques, including the use of confidential sources, undercover operations, physical surveillance, electronic

surveillance, investigative interviews, and the execution of state and federal search warrants to search locations for controlled substances, related paraphernalia, cultivation and/or manufacturing equipment, indicia, and other evidence relating to violations of the Controlled Substances Act, including violations of 21 U.S.C. §§ 841(a)(1), 846, and 856(a)(1). In my capacity as a Special Agent for the DEA, I have personally observed and identified methamphetamines, cocaine, heroin, liquid lysergic acid diethylamide (LSD), food items impregnated with marijuana, growing marijuana plants, and processed marijuana.

7.    I have participated in numerous investigations involving narcotics and controlled substances, such as marijuana, crystal methamphetamine, heroin, cocaine, and LSD. I have also participated in countless hours of surveillance, observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs. I have participated in and/or executed numerous search warrants authorizing the search of locations such as residences, storage facilities, and vehicles related to drug traffickers and their co-conspirators. These investigations have resulted in arrests of numerous individuals, the seizure of illicit drugs and drug-related evidence, and the forfeiture of drug-related assets.

8.    As a result of my experience, I have encountered and have become familiar with the day-to-day operations and the various practices, tools, trends, paraphernalia and related articles utilized by various traffickers in their efforts to cultivate, possess, import, conceal, and distribute controlled substances, including marijuana. I have also consulted and discussed these investigations with numerous officers who are very experienced in

Affidavit in Application for Search Warrants - Page 3 of 27

these types of investigations.

## FACTS ESTABLISHING PROBABLE CAUSE

9.     On October 28, 2013, the DEA Dallas Field Division and the Dallas Police Department executed an arrest warrant for an individual who had been charged under a federal indictment for conspiracy to distribute marijuana.  The arrested party immediately began to cooperate with law enforcement and consented to a search of his[1] residence in Dallas, Texas.  As a result, law enforcement located six plus pounds of high grade marijuana wrapped in bags, with some of the bags labeled as "GC," "BD," and "GM." The arrested party became a cooperating defendant ("CD #1") and debriefed about his source of supply (SOS), who lives in Austin, Texas.

10.    On November 4, 2013, investigators met with CD#1 again and were advised that he had been receiving marijuana from the SOS for approximately a year.[2]  Initially CD#1 purchased small quantities, but quickly transitioned into getting 10 – 15 pounds at a time, which occurred about every 8 – 10 weeks.  CD#1 advised that he had learned through the course of his relationship with the SOS that the SOS had access to large amounts of marijuana from a source in California and would receive shipments of 75 – 90 pounds of marijuana at a time.  The CD#1 explained that the Austin SOS would receive his shipment in Austin and then a delivery driver would drive to Dallas, Texas to give CD#1 his shipment.

---

[1] In order to conceal the identity of this cooperating defendant, throughout this affidavit this individual will be referred to as a male, regardless of what their true gender may be.

[2] Although CD#1 had been purchasing marijuana from the SOS for approximately one year, CD#1 advised that for about a five month period, he did not conduct any business with the SOS.

11.    On December 20, 2013, the Austin SOS was detained while trying to collect drug proceeds in Dallas, Texas, and decided to cooperate with law enforcement, becoming cooperating defendant #2 ("CD#2").[3]  CD#2 advised that the delivery driver he uses is named Owen MacIntyre and his California source of supply is Owen's son, Ryan MacIntyre ("MacIntyre"), who lives in California.   CD#2 advised that MacIntyre would typically front[4] him with 50 – 90 pounds of marijuana at a time, and has conducted hundreds of pounds worth of transactions with MacIntyre.   MacIntyre had informed CD#2 that he produced approximately 900 lbs. of marijuana this season (referring to the 2013 marijuana season).   MacIntyre also informed CD#2 that he had a silent partner in his marijuana grow operation named Daniel Darcy[5]; CD#2 is unsure of their agreement, but is familiar with Darcy because CD#2 had sold Darcy multiple pounds of marijuana, which was provided by MacIntyre.

12.    CD#2 advised that while in California on a trip MacIntyre gave him a T-Mobile Blackberry[6] cellular phone to communicate because MacIntyre thought the Blackberry would be more secure and harder for law enforcement to detect.   CD#2 also . provided investigators with phones numbers previously used by MacIntyre, including the

---

[3] In order to conceal the true identify of CD#2, this affidavit will refer to CD#2 as a male regardless of what the true gender may be.

[4] The term "front" means to provide marijuana without payment.   The purchaser pays for the product after they have sold it to their customer base.

[5] Darcy has the following criminal history: April 24, 2008 arrest for possession of marijuana (more than 4 ounces less than 5 pounds).

[6] During law enforcement's initial contact with CD#2 on December 20, 2013, investigators found CD#2 to be in possession of multiple cellular phones including a T-Mobile Blackberry.   As part of CD#2's cooperation, he gave written consent for investigators to search his cellular phones.

number (214) 620-5010.   CD#2 informed investigators that MacIntyre lives in Browns

Valley, Yuba County, California, in a house.   CD#2 further admitted that he had been to

MacIntyre's California home and that it has a greenhouse on the back of the property and

MacIntyre utilizes the property to grow marijuana.   Additionally, CD#2 believes that

MacIntyre utilizes an additional 200 acres in Yuba County to cultivate marijuana.

13.     On January 2, 2014, investigators conducted several records checks for Ryan

MacIntyre, which revealed an expired Texas driver's license and a criminal history in both

Texas and California.   MacIntyre's criminal history shows that he has been arrested in

Texas for possession of marijuana 4oz - 5 lbs. and two charges of manufacturing,

delivering, selling, or possession of a controlled substance, and driving under the influence

of alcohol or drugs.   In addition, records from a prior law enforcement contact with

MacIntyre revealed that MacIntyre had provided law enforcement with the phone number

(214) 620-5010.

14.     On January 3, 2013, investigators met with CD#2 to return the Blackberry

cellular phone that was given to CD#2 by MacIntyre.   After returning the Blackberry,

CD#2 was questioned about the seven contact names located in the phone in the secure

email portion.   CD#2 explained that two names (Blackpeter and Farthur) were names used

to communicate with MacIntyre, one name (Gandolf) was a name used to communicate

with Owen MacIntyre, and one name (Polly) was a name used to communicate with

Kathleen MacIntyre[7] (Owen's wife and Ryan's mother).   The other names belonged to

---

[7] CD#2 stated that MacIntyre had directed Kathleen MacIntyre to collect drug proceeds from CD#2 back in
November 2013.   CD#2 and Kathleen MacIntyre met in Crowley, Texas.   CD#2 gave Kathleen

other individuals involved with MacIntyre's marijuana trafficking organization. CD#2 took possession of the Blackberry and agreed to continue phone conversations with MacIntyre to further the investigation.

15.     On January 6, 2014, CD#2 communicated with MacIntyre through the ' Blackberry, and the conversation quickly transitioned into "drug talk." The conversation concerned MacIntyre trying to find a new way to transport marijuana to Texas due to his father being arrested with a load in Arizona. MacIntyre's current plan was to transport the marijuana via container. CD#2 asked if he needed to pay at the drop site or if he could have a couple of days to pay for the marijuana. MacIntyre advised that he would have to fly out to Texas, but MacIntyre would have to pay shipping in California before the shipment can leave. The CD#2 asked whether MacIntyre can ship something before or after his trip (to Mexico), and MacIntyre advised his network is still out of town and he (MacIntyre) has their "berrys" (Blackberry cellular phones) to give to them when they get back. So, MacIntyre was unable complete any deal at this time.

16.     CD#2 continued to have Blackberry conversations with MacIntyre in an effort to coordinate a marijuana shipment to Texas. The conversations took place from January 2014 to the present, all of which was monitored by investigators. Between the end of January until the end of February CD#2 and MacIntyre agreed not to communicate.

17.     On January 8, 2014, an administrative subpoena was issued and sent to Blackberry, regarding records pertaining to the Blackberry cellular phone email accounts of direwolf@vipexec.com (Farthur) and blackpeter@vipexec.com (Blackpeter). CD#2

MacIntyre $40,000 in currency that was wrapped up like a gift.

had advised that both of these accounts belong to MacIntyre.

18.    On January 9, 2014, records were received from Blackberry for the email accounts. A review of the records indicated that the same person has both of these cellular phone devices. However, the SIM card is being transferred between these two devices. Additionally, there was a third cellular phone device that the SIM card had been in before these two devices.

19.    On February 24, 2014, CD#2 had a Blackberry phone conversation with MacIntyre in which CD#2 advised that he may have a possible driver/transporter that they could use since Ryan's plan to ship through the use of a crate fell through. MacIntyre advised that it was good to have options and he wanted to talk about it. On February 27, 2014, CD#2 revisited the driver/transporter conversation with MacIntyre. CD#2 was able to set up a meeting between MacIntyre and the new driver/transporter. The meeting had to be rescheduled but ultimately took place on March 6, 2014.

20.    On June 20, 2013, Yuba County Sheriff's Office (YCSO) Deputy Mark Heath[8] conducted an over-flight of the **Subject Premises.** Deputy Heath was able to identify the Subject Premises from the aircraft by using geographic reference points associated with the GPS coordinates and property parcels.    Deputy Heath was able to identify a cannabis cultivation site visible from the aircraft.  He identified over 20 marijuana plants at this cultivation site.  The marijuana plants are in multiple rows and surrounded what appeared to be a greenhouse on three sides.  The residence on the

[8] It should be noted that Deputy Heath has been a law enforcement officer for over 10 years.  During that time, Deputy Heath has conducted over 300 marijuana related investigations.  Deputy Heath has observed suspected marijuana from an aircraft over 100 times and later confirmed his observations in person.  Deputy Heath has over 100 hours of illegal narcotic investigation training to include marijuana.

property is located less than 50 – 75 yards from the marijuana plants and has immediate access either by foot or by a dirt/gravel road that provides access to the greenhouse. Deputy Heath photographed the cannabis cultivation site to document his observations and this photograph is attached as A-2.

21.    I have reviewed Pacific, Gas, & Electric (PG&E) statement for the **Subject Premises**. The PG&E account for the **Subject Premises** was activated on March 18, 2014, with the subscriber listed as Noah Miller (Social Security number ending in "7944"). I ran queries of law enforcement databases and identified a Noah Miller with the last four digits of his SSN as "7944." I believe they are the same person. Miller has a California DMV address of 10375 Travertine Ct, Grass Valley, California, which is approximately 40 miles from the **Subject Premises**. Additionally, Miller has a prior criminal history of possession of marijuana for sales.

22.    On March 6, 2014, I, working in an undercover capacity, met with MacIntyre to discuss driving a load of marijuana to Houston, Texas. I positively identified MacIntyre through his California Department of Motor Vehicles (DMV) photograph. It should be noted that we spoke in coded language commonly used by marijuana cultivators and traffickers. During this meeting, we discussed shipping approximately 100 – 150 lbs. of marijuana to Houston, Texas. MacIntyre agreed to meet with me on March 17, 2014, to give me the marijuana to drive to Texas. I would coordinate this upcoming meeting with MacIntyre through the CD#2.

23.    CD#2 and MacIntyre coordinated the rental of a "vacation rental house" where MacIntyre would finalize the packaging of the marijuana to be shipped to Texas.

However, MacIntyre did not want to meet with the unwitting property owner of the vacation rental as a precaution. I agreed to meet with the unwitting property owner for the purpose of getting the keys to the property. The CD#2 arranged for MacIntyre and I to meet on Sunday, March 16, 2014, so MacIntyre could tell me in person the address of the vacation rental property. MacIntyre did not want the address communicated over the telephone. After MacIntyre told me the address, I could then meet with the property owner to obtain the key to the property (it was actually an access code for a keypad).

24.    On March 16, 2014, at approximately 10:00 a.m., YCSO Deputy Heath went to the **Subject Premises** and observed a 1999 GMC pick-up truck, bearing California license plate 6XPE316 (registered owner: Ryan MacIntyre, 2323 Mastlands Dr, Oakland, CA) parked in the driveway. Deputy Heath observed a silver box trailer attached to MacIntyre's pick-up truck. Deputy Heath did not continue surveillance on MacIntyre's vehicle.

25.    On March 16, 2014, at approximately 5:00 p.m., DEA agents observed MacIntyre driving the 1999 GMC pick-up truck, with the attached silver trailer, arrive and park for our meeting. MacIntyre texted the CD#2, "all good here I've made my road journey". I believe MacIntyre is referring to the fact that he transported the marijuana to the meet location without being interdicted by law enforcement. I met with MacIntyre and our meeting went as planned, and I left the area following the meeting. During the surveillance operations, surveillance agents attached a GPS tracking device (pursuant to a federal tracking order issued by U.S. Magistrate Judge Dale A. Drozd on March 14, 2014) to MacIntyre's vehicle. Surveillance then followed MacIntyre to the vacation rental

house.

26.     On March 17, 2014, I met with MacIntyre at the vacation rental property.  I backed my rental vehicle into the garage of the rental property, and MacIntyre told me he was finishing packaging the last few pounds.  I then watched as MacIntyre proceeded to load the marijuana into the trunk of my vehicle.  MacIntyre informed me that he could not fit the entire load (which was supposed to be 100 lbs.) in the trunk, but he was able to fit 75 lbs.  By MacIntyre's own statements too me, he still had at least 25 lbs. of marijuana in his possession since he could not fit the entire 100 lbs. in my rental car.  MacIntyre concealed the marijuana with black garbage bags then he shut the trunk, and I left the area.

27.     After MacIntyre left the vacation rental, investigators continued to monitor the GPS tracker that was placed on MacIntyre's vehicle.  The GPS tracker had MacIntyre's vehicle parked at a storage unit located at the Wildwood Self Storage, 18800 Pine Shadows Lane, Penn Valley, CA, 95946.  Nevada County Sheriff's Office (NCSO) Deputy Guy Selleck identified a storage unit, **"Unit #221,"** belonging to Daniel Darcy. Based upon my training and experience, marijuana cultivators will often store marijuana, proceeds from the sale of marijuana, pay/owe records and marijuana cultivation equipment at storage units to avoid detection from law enforcement.  I have reviewed the rental agreement for **Unit #221**.  The date of lease is listed as December 6, 2013, with the occupant's name as Daniel Darcy.  Darcy listed a Texas driver's license and provided an address of 7336 Bursey Rd, Ft. Worth, Texas, on the lease documents.  The fact that MacIntyre was still in possession of at least 25 lbs. of marijuana after I departed with the marijuana load, in addition to having his vehicle electronically tracked to this storage unit,

is probable cause MacIntyre is utilizing Unit #221 to further his marijuana trafficking operation. I further believe there is probable cause that evidence of marijuana cultivation and distribution will be found in **"Unit #221."**

28.    It should be noted that the GPS tracker is not producing the amount of information that investigators had expected. The Browns Valley, California area is a rural and remote area, and cell phone service is sporadic, in turn, our GPS tracker information has been sporadic.

29.    Based on the fact that YCSO Deputy Heath previously observed marijuana growing on the **Subject Premises** early in the 2013 marijuana growing season (specifically on June 20) and, to his knowledge, the property was never raided by law enforcement officers, I believe marijuana was produced on the **Subject Premises**. I also know that cannabis cultivation operations are continuous, ongoing endeavors. Due to this fact, even if the cultivator is between cultivation cycles, my training and experience leads me to believe there will be evidence of a cannabis cultivation operation at the **Subject Premises**. This evidence could be, but not limited to, "clone" marijuana plants, starter marijuana plants, "calendars" containing grow-cycle care information, work schedules/payment information for co-conspirators, the locations of additional properties that may contain starter marijuana plants that may be moved to the **Subject Premises** when they are big enough to put in the ground.

30.    In addition, MacIntyre was at the **Subject Premises**, a known marijuana cultivation site, the morning before he was supposed to leave for a "vacation rental property" where he was going to finishing packaging approximately 100 lbs. of marijuana.

Affidavit in Application for Search Warrants - Page 12 of 27

I know that cannabis cultivators and traffickers will generally keep a supply of narcotics on hand for immediate sale. The narcotics are commonly kept on the person and in locations associated with the traffickers, including in the home or in the vehicles of, or used by, the cultivators. Cultivators will often hide their supply of narcotics in garages, outbuildings, storage areas, and/or sheds associated with or near their residence and/or cultivation facility, or in yard areas surrounding such premises, by burying the narcotics or otherwise attempting to conceal its presence.

## KNOWLEDGE REGARDING MARIJUANA CULTIVATION AND TRAFFICKING

31. Based upon my training and experience in the investigation of controlled substance offenses, including those involving large scale cannabis cultivation and propagation, and based upon my consultation with other law enforcement agents and officers trained and experienced in large scale marijuana cultivation and drug trafficking investigations, I know that cannabis cultivators routinely engage in trafficking of their drug, and I know the following about cannabis cultivation, marijuana cultivators, drug trafficking and drug traffickers:

> a. Cannabis cultivation operations are continuous, ongoing endeavors. Due to this fact, even if the cultivator is between cultivation cycles, there will be evidence of a cannabis cultivation operation at their grow sites and in the surrounding areas. People who cultivate cannabis tend to operate all hours of the day and night and often tend to the cultivation facility at night, under the cover of darkness, to avoid detection by law enforcement.

b. Cannabis cultivators and traffickers generally use various methods to protect the property where the marijuana is cultivated from both intruders and law enforcement detection.

   i. Cannabis cultivators often possess handguns, shotguns, rifles, and other firearms and ammunition, which may be used for security during the production and distribution of cannabis. Cannabis cultivators and traffickers also retain documents that indicate possession, ownership, and method of acquisition of these weapons.

   ii. Cannabis cultivators and traffickers often use security systems and other forms of counter-surveillance, such as video cameras and monitors, motion devices, and "booby traps."

   iii. In addition, guard dogs are often used to protect cannabis cultivators' growing operations from theft and to alert them to subjects, including law enforcement, who are approaching their property.

   iv. Cannabis cultivators use an assortment of equipment to plant and maintain the product. This equipment includes, but is not limited to irrigation devices, garden hoses, five gallon buckets, ground timing devices, electronic watering devices, aerators, PVC pipe, water storage devices, lights, timers, power cords, generators, shovels, rakes, pruning shears, hand-held sprayers, herbicides, starter pots, planter pots, grow pots, paper bags, burlap bags, plastic storage containers, and books and magazines for growing marijuana, such as

> *High Times*, *Marijuana Growers Guide*, *Sinsemilla Tips*, *Marijuana*
>
> *Potency*, *Marijuana Botany*, and *Marijuana*.

c.  Cannabis cultivators also use an assortment of equipment for the use,

storage, processing and packaging of marijuana, including rolling papers,

cigarette packs, small medicine containers, glass and plastic vials, rolled up

papers for holding seeds, sifters, scales, and other weighing devices, drying

screens, pouches, backpacks, plastic storage containers,

surveillance/monitoring devices, and alarm sensors.   Cannabis cultivators

will commonly package their product where it is produced and also at their

residences.   With respect to cannabis, this packaging could include, but is

not limited to, the use of drying racks, trimming rooms/areas, scales to weigh

the cannabis, plastic baggies, and heat sealers to package the cannabis for

sale.   This equipment is commonly kept on the property, including inside

structures on the property near where the cannabis is kept or is being

cultivated.

d.  Cannabis cultivators and traffickers will generally keep a supply of narcotics

on hand for immediate sale.   The narcotics are commonly kept on the person

and in locations associated with the traffickers, including in the home or in

the vehicles of, or used by, the cultivators.   Cultivators will often hide their

supply of narcotics in garages, outbuildings, storage areas, and/or sheds

associated with or near their residence and/or cultivation facility, or in yard

areas surrounding such premises, by burying the narcotics or otherwise

attempting to conceal its presence.

    e. Cannabis cultivators often use vehicles to transport cannabis, equipment, and supplies for the cultivation and distribution of cannabis to and from the cultivation facility, as well as to and from the conspirators' residences. The conspirators use their vehicles, as well as the vehicles of their friends and associates, for such transportation.

32.    The parcels of property on which cannabis cultivators maintain cultivation facilities are often in fictitious names instead of the true names of the cultivators. Rural cultivators often live in residences on the parcels where the marijuana is cultivated. Conspirators in cannabis cultivation who have multiple cultivation facilities typically keep evidence of the location and ownership of such property at the cultivation sites (including inside buildings or other outlying structures on the sites), on their persons, in vehicles at the site, or at their residences, including personal letters and notes, phone bills, loan payment receipts, utility bills, rental agreements and documents, deeds, canceled mail, canceled checks, envelopes, keys, photographs, audio and video tapes, property tax records, escrow paperwork, assessor's information, topographical maps, parcel maps, payment records and receipts for method of payment, and other indicia of occupancy, residency, control, or ownership of the premises and things described in this warrant.

33.    It is common for drug traffickers to maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their drug distribution activities, in order to account for the transportation, ordering, purchase, manufacturing and distribution of their illegal drugs and the remittance of drug proceeds.

Affidavit in Application for Search Warrants - Page 16 of 27

Moreover, because drug traffickers will often "front" (that is, sell on consignment) controlled substances to their clients and sometimes be "fronted" controlled substances from their suppliers, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets. Such records, which are frequently encoded in order to protect those involved in the distribution activities, will often be maintained by drug traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so that they are close at hand and readily available for the purposes of ascertaining current balances. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

34.    Drug traffickers frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses and email addresses, sometimes encoded and sometimes not, for the purpose of contacting their suppliers, customers, transporters and others involved in their illicit drug distribution activities, and these records are typically maintained on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business. Moreover, such records are often stored electronically within the memory of computers, computer-related storage

devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

35.    Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship illegal drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related Internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, and package tracking records accessed over the Internet, on their person, at their residences, in structures at cultivation sites, stash-houses, businesses, and/or in their vehicles, where they are available for reference. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

36.    It is common for drug traffickers to conceal large sums of currency and precious metals, jewelry, wire transfer receipts, cashier checks, money orders, and other financial instruments or items of value which either represent the proceeds from drug sales

Affidavit in Application for Search Warrants - Page 18 of 27

or are intended for the purchase of controlled substances, including documentation relating to the purchase of real estate and motor vehicles; and when drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug traffickers will use different techniques, sometimes simply by locking large amounts of currency in secured containers immediately available to them, but also by the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate or vehicles, and the establishment of shell corporations and business fronts. They typically keep records of such activity, including accounting books, receipts, bank statements and records (of both foreign and domestic banks), money drafts, letters of credit, money order and/or cashier's check receipts, wire transfers, passbooks, bank checks, and tax returns. Drug traffickers often utilize fictitious or "strawholder" owners and shell corporations to conceal the true ownership and illegal source of real property, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances or make remittance for other costs relating to the distribution of illicit drugs. Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, the trafficking of controlled substances. Those involved in the distribution of drugs typically maintain currency and money counters, precious metals, jewelry, wire transfers, cashiers' checks, money orders, and other financial instruments, as well as records or other evidence relating to financial

Affidavit in Application for Search Warrants - Page 19 of 27

transactions, income, banking, and expenditures of money and wealth in connection with drug trafficking on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available.   Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

37.    Those involved in the distribution of illicit drugs often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport drugs or drug proceeds.   Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information, and records and receipts associated with airlines, rental car companies, and/or hotels, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers on their person, in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are readily available for use or reference.   Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

38.    Drug traffickers frequently utilize cellular telephones, satellite telephones,

pagers and text-messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as Palm and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these items, along with corresponding purchase, service, and billing records, are often maintained on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are readily available. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices. Records such as voice mail and text messages, address and telephone number lists and similar data may contain evidence of narcotics trafficking activities as well as the identities of co-conspirators, customers, and suppliers.

39. Drug traffickers frequently use pre-paid cellular telephones or cellular telephones subscribed in fictitious or "nominee" names. "Nominee" names are names of real persons who are not the trafficker. They may be friends, relatives, or co-conspirators who are aware that the trafficker is using their identity, or they may be innocent persons who are unaware that their identities are being used. Narcotics traffickers frequently employ more than one cellular telephone to conduct their illegal activities. Traffickers use this method to evade law enforcement electronic surveillance as well as to compartmentalize their organizations. Drug traffickers also frequently take, or cause to be taken, photographs and/or videos (which may be stored as CDs, DVDs, on video

cameras, or on portable media such as USB drives, external hard drives, or iPods) of themselves, their criminal associates, their assets (including real and personal property), their weapons, and their drugs, and such items are typically maintained on their persons, in their residences or nearby structures, businesses, and/or vehicles.

40.     Based on my training and experience, I believe that those involved in ongoing, long-term conspiracies to cultivate and distribute illegal drugs such as marijuana often maintain the types of items described above on their person, in their residences, in structures at and near cultivation sites, stash-houses, businesses, and in their vehicles on an ongoing, long-term basis so as to facilitate the conspiracy and prevent detection. Moreover, such items are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

41.     Accordingly, and in light of the facts and circumstances described above, I believe the aforementioned items, which are more particularly described in Attachment B, and which constitute evidence of, the fruits of, and/or the instrumentalities of a suspected marijuana cultivation and distribution conspiracy in violation of 21 U.S.C. §§ 841(a)(1) (manufacture), 846 (attempt and conspiracy), and 856 (using a premises for manufacture) will be found and seized as a result of the requested searches of the **Subject Premises.**

## INFORMATION REGARDING SEIZURE OF COMPUTERS AND RELATED STORAGE MATERIALS

### DEA's Need to Seize Computers and Related Storage Materials

42.     Based on my own experience and conversations with other agents, I know that individuals who cultivate and traffic in marijuana often store information regarding those activities on computers and related electronic storage devices. Accordingly, permission is sought herein to seize and search computers and related devices, consistent with the scope of the requested search.

43.     The information stored in an electronic format may be found not only on the hard disk drive of a computer, but on other computer hardware, peripherals, and storage media. In order to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware to be searched later by a qualified expert in a laboratory or other controlled environment. This is true for the following reasons:

> a. *Volume of Evidence*: Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also, when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.
>
> b. *Technical Requirements*: Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals

Affidavit in Application for Search Warrants - Page 23 of 27

and specialized equipment needed to conduct a thorough search. In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

c. *Files May Be Hidden, Erased, Compressed, Password Protected, or Encrypted*: The data search procedures used to recover electronically stored evidence are designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Without knowing the password for encrypted files, it may be impossible to view the information in those files. This is especially true with certain encryption algorithms and/or programs, such as Elgamal, Diffie-Hellman, DSA, and Triple-DES. Even less secure encryption programs may require considerable time or outside agency assistance to decrypt the files absent a password.

d. *Danger of Destruction of Evidence*: Computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, both from external sources and destructive codes embedded in the system such as a "booby trap." In order to maintain the integrity of the original evidence, a qualified expert may need to conduct a forensic examination of the storage media in a controlled environment, such as a law enforcement laboratory, where specific procedures and specialized software designed to protect the integrity of the original media will be used.

Affidavit in Application for Search Warrants - Page 24 of 27

44.     In order to retrieve electronically stored evidence from a computer, agents
may be required to seize most or all of a computer system's equipment, including
hardware, peripherals, software, documentation, security devices, and passwords.  This is
true because certain operating systems and hardware can be configured to operate only
with a precise set of hardware, software, and peripherals.  Peripheral devices that allow
users to enter or retrieve data from the storage devices may vary in their compatibility with
other hardware and software.

45.     The Computer Forensic Agent may have to install software used by the
suspect on a government computer in order to retrieve the information the suspect may
have stored using that software.  The Computer Forensic Agent may also need to refer to
hardware and software documentation maintained by the suspect to complete his/her
analysis in a timely manner.  The suspect's computer documentation may also contain
hand-written notes specific to the seized computer system.  Physical keys, encryption
devices, and similar items may be necessary to gain access to computer equipment.
Passwords, pass-phrases, password files, and similar decryption codes may be required to
access specific information stored on the seized computer system.

## REQUEST TO SEAL SEARCH WARRANT

46.     I believe that, should the contents of this warrant and affidavit be made
public, it would jeopardize this continuing investigation and any personnel assigned to or
cooperating in this investigation.  I also know, based upon my training and experience,
that if the subject of this investigation or his associates were notified that a criminal
investigation exists, they would have the opportunity to destroy evidence, notify

co-conspirators, or flee from prosecution.   For the foregoing reasons, and because this is

an ongoing investigation, I request that the warrant and the accompanying affidavit be

sealed until further order of the court.

///

///

///

**CONCLUSION**

47.     Based upon the evidence set forth herein, I believe that there is probable

cause that evidence, instrumentalities and fruits of the crimes of manufacture of cannabis,

possession for sale and distribution of cannabis, and conspiracy to manufacture and

distribute cannabis, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 856, will be found at

the **Subject Premises** and **Unit #221.**  For these reasons, I respectfully request the

issuance of a search warrant for the location described and depicted in Attachments A1-A3

authorizing any agent of the DEA, with the assistance of other law enforcement officers, to

enter and search the premises for items more particularly described in Attachment B, all of

which are evidence, instrumentalities and fruits of violations of 21 U.S.C. §§ 841(a)(1),

846, and 856(a)(1).

I declare under penalty of perjury that the statements above are true and correct to

the best of my knowledge and belief.

Jon Rasmussen
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me
This 25 day of March, 2014

HON. KENDALL J. NEWMAN
United States Magistrate Judge

Approved as to form

HEIKO P. COPPOLA
Assistant United States Attorney

# United States District Court

|     |     |     |
| --- | --- | --- |
| **EASTERN** | District of | **CALIFORNIA** |

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

**Wildwood Self Storage, 18800 Pine Shadows Lane, Unit #221, Penn Valley, California 95946**

## SEARCH WARRANT

CASE NUMBER:

**2: 1 4 - SW - 0 1 7 2 ⁗ KJN ⌐**

TO, <u>JON RASMUSSEN</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by JON RASMUSSEN who has reason to believe

that ☐ on the person of, or ☒ on the premises known as (name, description and/or location)

**SEE ATTACHMENT A-3, attached hereto and incorporated by reference**

|     |     |     |     |     |
| --- | --- | --- | --- | --- |
| in the | **EASTERN** | District of | **CALIFORNIA** | there |

is now concealed a certain person or property, namely (describe the person or property to be seized)

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ Apl 8 2014 _____
                                                          Date

(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and making the search ☐ in the daytime — 6:00 AM to 10:00 P.M. ☐ at any time in the day or night as I find reasonable cause has been established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to any authorized U.S. Magistrate Judge in the Eastern District of California, as required by law.
                                  U.S. Magistrate Judge (Rule 41(f)(4))

March 25, 2014    8:45 A.M.    at    Sacramento, California
Date and Time Issued                        City and State

Kendall J. Newman, U.S. Magistrate Judge                        Signature of Judge

SEALED

| RETURN | | Case Number: |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT RECEIVED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

Signature of Judge                                        Date

## ATTACHMENT A-3

**Unit #221** is a storage rental unit located at the Wildwood Self Storage, 18800

Pine Shadows Lane, Penn Valley, CA, 95946. **Unit #221** is marked as such and

described as a 10 X 20 ft. storage unit. This search warrant includes **Unit #221** and all of

its contents.

## ATTACHMENT B

### DESCRIPTION OF PROPERTY TO BE SEARCHED AND SEIZED

(a)    Marijuana in various forms, including growing plants, harvested plants and stalks, drying, dried, or processed marijuana, marijuana seeds and/or marijuana plant "clones."

(b)    Equipment used for the protection of the property on which the cannabis is cultivated, including handguns, shotguns, rifles, and other firearms and ammunition (as well as documents that indicate possession, ownership, and method of acquisition of these weapons) and security systems and any form of counter-surveillance, such as video cameras and monitors, motion devices, and "booby traps."

(c)    Equipment to plant and maintain marijuana, including irrigation devices, garden hoses, five gallon buckets, ground timing devices, electronic watering devices, aerators, PVC pipe, water storage devices, lights, timers, power cords, generators, shovels, rakes, pruning shears, hand-held sprayers, herbicides, starter pots, planter pots, grow pots, paper bags, burlap bags, plastic storage containers, books and magazines for growing marijuana, including *High Times*, *Marijuana Growers Guide*, *Sinsemilla Tips*, *Marijuana Potency*, *Marijuana Botany*, and *Marijuana*.

(d)    Equipment for the use, storage, processing, or packaging of marijuana, including rolling papers, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, scales, and other weighing devices, drying screens, pouches, backpacks, plastic storage containers, surveillance/monitoring

devices, alarm sensors, drying racks, trimming rooms/areas, scales to weigh the cannabis, plastic baggies and heat sealers.

(e)     Evidence of the location and ownership of property used for growing cannabis, including personal letters and notes, phone bills, loan payment receipts, utility bills, rental agreements and documents, deeds, canceled mail, canceled checks, envelopes, keys, photographs, audio and video tapes, property tax records, escrow paperwork, assessor's information, topographical maps, parcel maps, payment records and receipts for method of payment, and other indicia of occupancy, residency, control, or ownership of the premises and things described in this warrant.

(f)     Records accounting for the distribution of illegal drugs and the remittance of drug proceeds, including records of drug sales, lists of persons who owe money and who are owed money, accounting books, receipts, purchase orders, notes, ledgers, notebooks, computer spreadsheets, forms of "pay/owe sheets," and records relating to the transportation, ordering, purchase, manufacturing, cultivation and distribution of controlled substances, and in particular, marijuana.

(g)     Records listing names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses.

(h)     For the period 2010 to the present, records relating to the use of the United States Postal Service, FedEx, UPS, or similar parcel services, to ship illegal drugs and/or drug proceeds, including receipts, copies of airbills, and package tracking records.

(i)     For the period 2010 to the present, financial records, including accounting books, receipts, bank statements and records (whether domestic or foreign), money drafts, letters of credit, money order and/or cashier's check receipts, wire transfers, passbooks, bank checks, tax returns and other items evidencing the possession, obtaining, secreting, transfer, and/or concealment of assets and the possession, obtaining, secreting, transfer, concealment and/or expenditure of money.

(j)     For the period 2010 to the present, items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking (including trafficking of marijuana), including records concerning currency, precious metals, and/or jewelry valued in excess of $1,000, documentation relating to the purchase of real estate or motor vehicles; money counters; records evidencing the establishment of shell corporations and/or business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders; and money counting machines.

(k)     For the period 2010 to the present, records relating to travel by car, bus, train, or airplane, both domestically and to foreign countries, including calendars, travel itineraries and schedules, maps, airline ticket and baggage stubs, frequent-use club membership information, and records and receipts associated with airlines, rental car companies, and/or hotels, credit card bills and receipts, photographs, videos, passports, and visas.

(l)     Any computers and computer-related storage devices, including USB or thumb drives, CD-ROMS, diskettes, external hard drives, iPods and other storage media,

and cellular telephones, satellite telephones, pagers and text-messaging devices,
voicemail or answering machine systems, telephone calling cards, and personal digital
assistants such as Palm and Blackberry devices, and the purchase, service, indicia of
ownership and billing records pertaining thereto.

(m)     Photographs, videos, and any video or audio recordings pertaining to
production, possession, or sales of narcotics, and assets obtained with narcotics proceeds
and/or trafficking in controlled substances, in particular marijuana, and/or weapons,
including recordings stored on video cameras.

(n)     Telephone numbers, names, addresses, text message addresses and other
identifying information regarding persons making calls to and persons called from the
cellular telephones found on the premises searched.